We have two PTAB cases, Liquid Power Specialty Products v Baker Hughes, 2020, 2001, 2021, 2283. Mr. Reines. Thank you, Your Honor, and good morning. I'm appearing here on behalf of Liquid Power. For the second time, the Board has disregarded extensive evidence of objective indicia that are decisive in this particular case. Let me be specific about that and talk about the errors. I'm going to start again into the evidence, but on commercial success, that is an excellent example. The reason that commercial success was essentially disregarded in total, minimal weight, and no... Mr. Reines, these are fact questions. I'm saying you've got a substantial evidence problem, and the Board went through each of these one by one, and how do you deal with that? Thank you, Your Honor. Obviously, the first question that we all think of when we see this file. The answer is that it's common for the Federal Circuit to look at the treatment of objective indicia by the Board and other bodies and determine that, in general, it was disregarded and not given weight, or was it treated as an afterthought? Leo Pharmaceuticals, I think all of you, Your Honors, have been on panels that have done exactly that. If I could just give the commercial success example, because I'm keenly aware of the substantial evidence measure. What we have here is shifting the burden improperly, which is a legal error, and disregarding evidence, which is a legal error. In PPG recently, this Court overturned a case exactly that way, just as factually intensive. Let me give you on the commercial success, because I think, again, this is a perfect example. Nexus was undisputed. Normally, that's the hard one. This Court actually found there was evidence, proof of commercial success, driven by the features of the 118 patent. Remarkable, coming into it. Commercial success was driven by features of the 118 patent. This Court already determined there was proof. Why did the Board neglect that? They stated there wasn't enough proof that the actual extreme power product was successful commercially. That tried to be measured, but that is, I can only use the word, preposterous. The evidence in the record was from Baker, that it commands very high margins, A3874. The Board said, Patent Donor does not provide any sales figures or evidence as to how EP sales relate to the overall DRA market. And the heavy crude market, too, points out. The evidence we submitted showed that the potential market size for Baker coming into the market was over 200 million. That's at A3877. So we know it's at least the $200 million market, because there's undisputed evidence from Baker that says that that's at least what they thought they could get on day one with their competing things. You don't want us to do fact-finding? No, I want you to say that if it's a product that commands very high margins, has a price premium, is the only product in the market, and then, for example, Your Honor, Flochem stated that it dominates the market. How could you dominate a market that's obviously millions of dollars and then say that's not success? Another example is we put in evidence that there was 12 million gallons of it sold and that it was widely recognized as a market leader, unquestioned. If someone didn't think that was true, they could have disagreed. I want a case like In Rui Huang, though, the 1996 Federal Circuit opinion, where in that particular case, the applicant came forward with sales of those tennis racket hand grips, and apparently it sold millions of them. Our court ruled, well, you didn't provide enough context. Yes, you sold millions of these things, but what we don't have right now to evaluate the strength of those millions is what was the market looking like? To what extent did you grow the market or take over the market? That is what was lacking there, and so that's why, in that particular case, there wasn't that much weight given to the commercial success evidence. Why isn't that very similar to what we have here, where you're telling us millions of gallons were sold, but we don't know year-to-year, we don't know market share, we don't know if this market was that strong in terms of how much of a need there was at the particular time you started selling it. There's other pieces of evidence to fill out the picture that the board felt like was needed and seems consistent with the Huang opinion. Yes, that excludes so much of the record here. For example, conventional DNA products were not even compatible with heavy crude, so there was no other product prior to extreme power. That's at A3954. That's their document. What about LP300, LP400? I was reading those marketing materials. Those are Liquid Power's other products that were on the market specifically for heavy crude. Well, no, they were generally for not heavy crude, and there was a marketing document. It's what it says, right? No, the marketing document says it can be used in heavier crude or heavy crude. Designed specifically for heavier types of crude. Well, heavier types is different than heavy. And then on the back page, designed for use on heavy petroleum crude oil. But there's a very good answer on that. At table four of the 118 patent itself, there's a table that compares the performance of that exact LP300. It shows it's got no drag in heavy crude, and the product, the preferred embodiment, is showing 30% drag. Okay, but I don't remember that being presented to the board below in your remand brief. I believe it was. It's in the patent itself. Right, but we can't expect the board to look at the topics you want to argue, and then go back and read through everything in the record, and try to find all the things that are consistent with the topic that you're identifying. I get it, but where I don't see this context argument is an adversary states that we're dominating the market due to our IP. Okay, that's at 83980 referring to our extreme power product. That's not success. We're commanding very high margins. That's not success. There's a price premium because we're the only product in the market. In fact, that quote is in 2013. Only product in the market is extreme power. Only product. Baker sees a need, and customers are asking for it. I mean, can you really look at this overall thing and say they're not even showing that the product's successful? Again, you're asking us to be a fact finder. The board went through all of this. It said there was no long felt need. The results were not unexpected. The industry praise was the praise of your client, not industry. Yes, they went through everything and strained, and so I went through commercial things. Isn't that substantial evidence? No, it is not because they disregard. I mean, on commercial success, I don't think you could demand more to show success than the evidence that I just gave you. Twelve million gallons, over $200 million market when they came in. So we're the only one in the market. Someone's coming in, and they say they're going to get $200 million in their first year. That's not evidence that this is a substantial market. Is anyone serious that this isn't a substantial market? We're the only product in it, and we're commanding very high margins because of that, and we dominate the market. If the panel's view is that that's not enough to carry our burden of showing success, that the product's successful, then I just respectfully disagree. But let me move on to some of the ones that you're on a reference. Before you move on, wasn't one of the issues that the board felt that some of the evidence that was given, especially the testimony of one of the experts, had no foundation? That it did not have – it wasn't supported by invoices and things that we normally look at when we're looking for commercial success? Yeah, I mean, so if there was any contest about it, I could understand. It was a declaration under OATS submitted by an executive of Liquid Power that stated that there was 12 million gallons sold at the relevant time, which is an enormous amount because it's just an additive, and there was no challenge to it. Yes, they disregard – everything is – there's some excuse for why they disregard it. If there's no challenge to that, that should be good enough. You don't need to put invoices and ledgers in. But let me go to unexpected results because I think this is on probative value. But that's what the board is going to be looking for. That's what I'm looking for here. You can't just pull a number and say this is the amount of sales that we have for this particular product. A business executive without contest from the other side? No, I want to see what this executive is relying on. All right, well, like I said, I think I gave a massive amount of proof that the product was successful. If the conclusion of the panel is that that's not enough to say it's successful, then that's just a disagreement. But let's talk about unexpected results. Unexpected results are obviously important. The panel found – the board found that there was surprising effectiveness, but that the products that it was comparing it to, the prior art products, the traditional DRAs, that Baker said are incompatible with heavy crude. I gave you that site unchallenged. They said, well, it's really a matter of degree because they didn't work so great. There again, the patent shows that the big difference between the patent and the prior art products. Not surprisingly. But in any event, it's undisputed. This is no fact. The challenge, Your Honor, they gave me, which is a good one, doesn't apply. They said, yes, it's surprisingly more effective than the prior art. What else are they going to say on this record? But we're not counting it because it's an improvement of degree, not an absolute – As I understand the argument that was presented to the board by Liquid Power, it was premised on there were no DRAs that worked in heavy crude at all. And then the board took that argument and said, no, that's not true because there's Eaton, and there's LP300, LP400. And so what we have here is an argument that nothing worked before at all, and now we have this unexpected result that something worked and something worked really well. But that's not true. It just worked better, most likely, than these things like Eaton and LP300, LP400. And more to the point, when you're trying to make an argument that there's an unexpected result over something that already existed in the prior art, well, then you have to do a comparison against that prior art. And I don't see that particular comparison to the closest prior art being made in the briefing to the board. It's being made now. In the briefing to the Federal Reserve team. But before the board, I don't see Liquid Power asking the board to say, look at my properties and my results and compare them to what I'm identifying as the closest prior art and look at their puny results. This is truly unexpected, the magnitude of the difference between the two. Okay. It's already in the record, but it doesn't matter because the board found that it was surprisingly more effective than the prior art. And the argument that we waived it because we said that it was completely better and they said only a good bit better, they didn't say it was a trivial amount. They didn't minimize it. They said that it wasn't in the claim. I mean, this is legal. I mean, maybe no one wants this to go forward, but it is a legal argument. The reason they excluded that was not based on a waiver, which doesn't work. We argued that it was much better. We argued that nothing did it. The truth of anyone reading the record knows that the conventional DRAs weren't even compatible with heavy crude, as Baker admitted. But the point here is they said because the claims don't have an effectiveness quotient, it doesn't matter that it's surprising. And, Your Honor, Judge Lori, you know about the unexpected results just from all your career. And that's so important. And what they said is, well, it was surprisingly more effective, not surprisingly from nothing to zero. That's important because they also said we have no predictive capability in the area. So they admitted, Baker admitted, they looked at the patent, the patent that's at issue, and they said we have no predictive capability in this area. It's an unpredictable area. You can say to me that's factual. It's disregarding evidence. And that's what case after case is. You can't do that. So it's an unpredictable area. This was in 2009, a couple years after the patent issued. It's pretty scary. There's undisputed surprising effectiveness. And the party that's making the argument had the prior art additive that they're saying you should use for heavy crude from the 1980s. They had it for decades. And they didn't use it until 2014. They say their 2014 product is based on a 1980s patent that they had. And that's their obviousness theory. Yet they didn't use it when they could have had this pot of gold of commercial success that we all know actually happened. And the reason is they said we have no predictive capability in the area. We don't know what's going on. So unexpected results is strong, and it matters. If it's not predictable that holding something that was used for kerosene or something over into a heavy crude, you know, if that's surprising, then, you know, that's not obvious. A long felt need. This court identified proof that there was hundreds of millions of barrels annually of heavy crude since the 1990s. There's a 2004 article that talks about the reason that heavy crude was smaller than the rest of the crudes is because transportation is such a problem because there was no drag reducing agent. That's the sincere article, 83641. So there was a long felt need. And the board found that it was immaterial because the same relative efficiency thing. Well, I thought the board said they found other pieces of the record saying that at the time of the invention in 2006, you know, DRAs for heavy crude was still a market that was still out into the future. Someday in the future kind of a market. It was 2004, and that's the article I just cited. What the article from 2004 says is heavy crude, which is obviously we all know heavy crude's out there. Heavy crude is growing at 25% increase in the last few years. And the problem with it is transporting it because there's no effective DRAs. So, of course, heavy crude wasn't a huge thing because they didn't have a good DRA that worked. We solved the problem. And you're telling us we were a passive valid. Mr. Linus, you're into your rebuttal time. You can continue or save it as you wish. You are very kind, Your Honor. I will sit and listen. Thank you. Mr. Leitch. Good morning, Your Honor. This may please the Court. These cases are really quite straightforward, as you pointed out. This is a substantial evidence issue. The board had one thing to do on remand, and that was to go through, consider the objective evidence, and determine how much weight to give it. It did that. It went through each objective indicia, described the evidence presented, and explained its reasoning why in each case that was entitled to little weight. Now, LSPI does not challenge in either appeal that those findings lack support by substantial evidence. Instead, they simply want to spin their narrative again in hopes that you will buy the narrative and simply disregard all of the board's findings, which were to the contrary. Now, to address a couple things that we just heard, commercial success, one, LSPI cites to the PPC broadband case and at the same time says, well, I don't know what else the board could be looking for. We couldn't demand more. How about the evidence aside from cases? He says commercial success was very clear, and the board disregarded some of the evidence. Well, I think the board found that commercial success was not very clear, and that's because there was essentially two main documents or two main arguments presented to it. One, that it sold 12 million gallons. Now, our opponent just said, well, that's an enormous amount. But that's the problem. There's no evidence to show that's an enormous amount, and that's what the board said. We don't know if 12 million gallons is a lot or a little because there's no market share. There's no revenue figures. There's none of the things that would typically be associated with commercial success. That's 12 million a year or over a span of time? You know, I'm not even sure, Your Honor. It was a single statement in their expert's opinion, and as the board pointed out, it was lack of foundation. That's the sort of foundational evidence that I think the board would have appreciated. What about the fact that there was some statement in the record that I described liquid power as the only supplier of this? Yes. Suggesting that, you know, they got all the market share. Well, so first, I'm not sure that document was actually cited in the commercial success section. As you pointed out, LSPI seems to have expected the board to have gone and collected any evidence that it may have cited for different things and essentially concocted their own commercial success argument. But as far as that document goes, I think at a certain time period, they may have been the only one in the market, but that itself does not mean that there was commercial success, and that's what the board essentially found is, look, we've got some evidence here. We've got evidence that they had high margins because they were the only one in the market. Possibly due in part to their patent position. And we've got evidence of 12 million gallons, but that's all we have, and that alone is not enough for us to say, to give the evidence of commercial success more than a little weight. If they're the only party in the market, and they've got significant amount of sales, isn't that commercial success? Well, I'm not sure if they had a significant amount of sales or not, and I think the board wasn't sure of that. We know they sold 12 million gallons. Was that to one customer? Was that one sale? There was none of the foundational evidence. There's no competing evidence that shows that that's not significant in the market. That's true. And for that, I want to point out the burden of production, as far as evidence on the objective indicia, lies with the patent owner. And patent and LSPIs made some arguments that, well, it was somehow Baker Hughes's duty to come in and rebut this. And that's simply not the case. There's plenty of cases where the ruling was, look, we've got some evidence here, but it's just simply not enough. I guess your position is that on appeal here, it's not enough to have substantial evidence of, say, commercial success, but there is substantial evidence supporting the board's position that there wasn't. Absolutely correct, Your Honor. There was substantial evidence supporting the board's position that there was not. And it's consistent with many of the cases in this area, where statements such as we sold X number of gallons without more context just simply isn't enough to be given a lot of weight. What about unexpected results? The board seemed to acknowledge that there are unexpected results, perhaps a lot of unexpected results. And so for that reason, it didn't accept the premise of Liquid Power's argument that there was nothing out there that had worked ever before, and they were the first one ever to find a DRA for heavy crude, and that was an unexpected result. Okay, so they rejected that argument. But nevertheless, they did seem to find unexpected results, and then it's unclear to me whether they gave that finding any weight in the overall analysis of non-obviousness. Yes, Your Honor. So they do have a couple of statements where they say, and in particular really regards this pretty scary, and I mean it, email document. It was actually Baker Hughes's position that that document appears to show some surprise, maybe as to degrees of drag reduction. LSPI vehemently argued against that, saying, no, there's no evidence of that. This is nothing worked before, and here it worked. You mentioned now LSPI is trying to make that argument, and you even mentioned now they're saying, well, look, everything that worked before had puny results. And I'll point out there's no evidence to support those statements. Throughout their reply briefs in these appeals, they say things like the prior art barely worked and was so ineffective as to be commercially useless. They don't cite anything to support that. They simply didn't present evidence as to here's our degree, here's the degree of the prior art. My opponent here just pointed to one test example in the patent specification on their LP300 example. In one oil, one very heavy crude oil, that showed 0% versus I believe it was 30%. That's simply one test, and as you pointed out, the board relied on marketing materials of that same product, LP300, that shows a graph here up to 50% drag reduction in heavy crude. They don't have any comparative data against the LP400, which the board also pointed out achieved drag reduction in heavy crude, and we have the same graph up to 50%. They don't have any comparative data against their own CDR102 flow improver, which has a similar graph and which says it's commercially effective at API gravities as low as 23. So they simply didn't present evidence to the board on the degree of drag reduction comparison, and they haven't done it here. They've just simply thrown out conclusory statements that the prior art barely worked, which are contradicted by the record in this case. With respect to praise and acknowledgement of the condition, the board found that there was no nexus, right? And even though we found on remand when the case came up to us before that there was nexus in this particular area, yet the board finds that there's no nexus. Is that not error? I don't believe the board found there was no nexus, Your Honor. You're referring to the praise? Praise, yes. So what the board found with respect to praise was that the main document that LSPI had been relying on was a little bit tricky. It was essentially notes taken by a Baker Hughes employee while attending a presentation of an LSPI scientist. And so we had to kind of point out, look, yes, this is a Baker Hughes employee taking these notes, but it's very clear when you dig into it that he's just writing down what was said at this presentation. So essentially what the board found was this is self-praise. This praise is coming from LSPI, not from Baker Hughes as they're contending. I don't believe that's a nexus issue. I think it's an issue of how much weight self-praise should be entitled to. And the board found not very much, which, again, no challenge as to whether or not that's supported by substantial evidence. So I don't believe they ignored nexus in this instance. So the other argument that you heard was what we called the Naaman argument, which was essentially that Baker Hughes had the Naaman prior art, the heteroatom-containing DRA for crude oil, for a decade and didn't use it. And therefore they've argued that's somehow dispositive as to obviousness. Now, again, that asks you to simply disregard all of the factual findings of the board, specifically those related to long-felt need, failure of others, and copying. This is what the board actually found, that the need did not exist for a long time and was rather a more recent need as the heavy crude market was expanding, specifically referring to Baker Hughes' emails that titled it The Way of the Future and a Future-Relevant Hydrocarbon Source. So Baker Hughes wasn't trying to get into this field. Then, with respect to evidence of failure, the board found that there was no evidence of failure, rather that there was no program in place at Baker Hughes to develop a commercial product for heavy crude DRA. What about Mr. Arinas' chicken or the egg theory, which is that the heavy crude market was hampered by the fact that there wasn't an effective DRA. And that's why the market at that time was relatively small. But at the same time, people in the industry were asking for something like that, a DRA for heavy crude. Your Honor, so a big part of that argument was based on an article, which is simply not – it's a mischaracterization of that article. That article talks about a number of things, the lack of a DRA being one of them. The 2004 article Mr. Arinas was talking about? It is. It also, I believe, specifically says that there's things in progress to get a better DRA, but it discusses lots of different issues with heavy crude. What the board found was that the heavy crude market was expanding, and LSPI may have gotten in at the beginning of a market. Baker Hughes didn't have interest. They had a couple people there that were sending emails saying, hey, we should get going. This is the way of the future. But there was no program in place until 2014. The documents that LSPI cites for failure, the board found, they talk about let's start a program. Here's a preliminary idea for a program to develop such a product. And so, you know, it's not that there wasn't DRAs. There was. The board found the LP300 works, the LP400 works. It's simply that the market was expanding. Light crude, everybody wants to extract and pump light crude because it's the easiest. But as that dries up, you have to move toward heavy crude. And so that was what was happening at that time. And then as Baker Hughes did actually try and get interested around the 2014 timeframe and start to develop a program, what the board found is they actually successfully used their own patented technology, crediting the testimony of Dr. Epps. And that patented technology is, in fact, the Neyman patent. So this idea from LSPI that, well, Baker Hughes had the Neyman patent for 10 years and they really wanted a DRA for heavy crude, and they were trying and failing and they could never get it to work, is completely contradicted by the board's findings, which is that it wasn't terribly interested in a heavy crude DRA until much later, and that when it did, in fact, start a program, it used the Neyman technology to develop a successful product. How close in structure and formulation are what's disclosed in the Neyman patent that you're saying was used as the roadmap versus Polymer A and the 118 patent? Yep. Which arguably is very, very, very, very close to the product you developed. Yes. So the high percentage of the Baker Hughes product does, in fact, use a monomer that is in the LSPI specification. It also happens to be in the Anioka reference. But the key here is that when you come to polymer science, the fact that that monomer exists, even in a high percentage, doesn't make the products all that similar. And the board went through a lot of testimony on this and credited the testimony of Dr. Epps, who's a polymer scientist that really understands this stuff. And what he said is Neyman describes adding additional ingredients, such as an amine, and then doing some cross-linking. And what ends up happening when you use that technology is you basically take your monomer and you are able to expand it out and get a product that functions much differently and sometimes much more effectively. And so, yes, the percentages of the monomer are high, but when you look at the polymer chemistry of all of this, the resulting products, even if the additional ingredients are at a low percentage, it is a very different product. And the board relied on extensive testimony from Dr. Epps to find that. And, again, LSPI just simply hasn't challenged that those findings lack support by substantial evidence. They just want to tell a different story and hope that you'll ignore the board's findings and buy the narrative. With that said, Your Honors, unless there's any other questions, I'm happy to yield the rest of my time. Well, no one ever loses points by not using up all their time. Mr. Linus has four minutes plus. Thank you. I may lose points, Your Honor, because I think I'm going to use my time. I'd like to, you know, look at the evidence. At least let's take one exemplary piece. I'm not going to drag you through the appendix, but if we could look at A3877 in the 118 appeal, which is 2020-2001, if you don't mind. Could you say that number again? Sure, it's APPX3877. 3-8-7-7. 3-8-7-7. In the 118 appeal, which is the 2021 appeal. 2001 appeal, excuse me. You've got to tell us what's in it and what it says. Yes, I mean, so this is the document for their new program to justify their product. And it says, Phillips 66 Extreme Power is the only DRA capable of providing drag reduction in heavy crudes at this time. So the idea that there's all these other things that are working well, when it's agreed there's one and only one that works. And then they justify it. And then below that, this is A3877, is the chicken and the egg point. What's the benefit of you having a competitor with extreme power actually having a heavy crude? So there'd be two in the marketplace. And it says, well, then people will be able to flow more heavy crude. Because if we can do this, that market will expand. Then it identifies over $200 million in the market the first year that they're going to get, if they can compete with us. Then it says, the profitability is Baker Hughes will be able to effectively compete within a market that is currently unattainable. This is all undisputed. It's their document. I mean, I understand substantial evidence. But we don't have to put our heads in the shell. What does that mean? So this is dated May 2013. Yes, 2013. Okay, so this is about seven years after the priority date. Right, when they finally, yep, yep. And in fact, to the point that they weren't working on a program until then, in 2012, at A3906, they talk about they have no competitive product, but are continuing to work. So they were working on it. And there was letters asking them for it in 2006, 2009. But the point of it all is, counsel acknowledged virtually everything. I mean, I didn't see the controversy. He said it was an expanding market. You heard it. It was, we came in first. We created the market for DRA. Okay, thank you for acknowledging that. How can you deny it? We were successful. They didn't have a program. And they had the patent that supposedly the priority makes it obvious. That's why this is decisive evidence of objective indicia. Because they had the patent that tells you that you can use DRA, but it teaches you not in heavy crude. And now it got ported over to heavy crude, and they waited 30 years. There was money on the table they could have made. Is it really, on the face of this record, can we say that it was a fair fact-finding by the board, whether you want to call it disregard or burden-shifting or substantial evidence, that they didn't want to get into it because they just didn't care about it? No, they wanted to get in the market because it was hundreds of millions of dollars, which is why it's laughable that there's no success for the product, extreme power. It's all over, littered throughout the documents. If the court were to go your way, what would we do about the statements in the marketing materials for LP300 and LP400, which make it pretty clear on its face that those products were made and designed for use with heavy crude? Which, everyone agrees, even though they were for sale, that they're not for heavy crude, and that there was no conventional heavy crude. But let's assume that those are out there. There's an agreement. What it says. Right. It says the marketing materials pitch for heavier oils. That's true. We have in the patent itself, which we did identify, because, in fact, this court looked at the 118 patent and said the 118 patent shows unsurprising results. We're flowing to that table. How is it that we didn't do it? You did it. So, clearly, there was improved performance. But the point on the degree of improvement is it was a surprising improvement. Of course it was. And they neglected it because they said the claims don't require that. And I haven't received any questions. I've got some spirited questions. But no one's saying that the claim has to require that it works. Great. That's not what's needed for unexpected results. It's just, wow, it's working great. They had the patent. They did no predictive capability in this space. Counsel, as you see, your red light is on. Do you have a final conclusory statement? I will be very brief, Your Honor. There are cases that come where the objective indicia are decisive. In the last few years, there's been a lot of neglect of them because they're not what the boards used to. This is the perfect vehicle to be clear that when you have oodles of objective indicia on an important set of patents, that they should be respected. Thank you. Thank you, Counsel. The case is submitted.